UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-61830-Civ-SCOLA

Federal Trade Commission,

    Plaintiff,

vs.

IAB Marketing Associates, LP, *et al.*,

    Defendants,

Avis S. Wood and Tressa K. Wood,

    Relief Defendants.
_____/

## ORDER DENYING RELIEF FROM ASSET FREEZE AND DENYING MOTION TO STAY

The IAB Defendants[1] were involved in a scheme to market and sell healthcare plans to consumers by getting consumers to become members of an association that purported to offer members major or traditional health insurance, or the equivalent of such insurance. The Federal Trade Commission (FTC) alleges that this scheme was deceptive in several ways. As detailed more fully below, the Court has found that the FTC is likely to prevail in proving that the scheme was deceptive and illegal, and that the public interest is best served by freezing the IAB Defendants' assets so that the Court can eventually redress consumers' injuries. It is against this backdrop that the Individual IAB Defendants' current motions to stay the proceedings and to lift the asset freeze to pay for living expenses (DE 110 and DE 217) must be understood. For the reasons set forth below, the Court **DENIES** those Motions (DE 110 and DE 217).

---

[1] The IAB Defendants consist of the following Defendants: Independent Association of Businesses; IAB Marking Associates, LP; International Marketing Agencies, LP; Healthcorp International, Inc.; JW Marketing Designs, LLC; International Marketing Management, LLC; Wood, LLC; James C. Wood; James J. Wood; and Michael J. Wood. Collectively, for purposes of this Order, these Defendants are referred to as the IAB Defendants or the Defendants. Defendants James C. Wood (James), James J. Wood (Joshua), and Michael J. Wood (Jacob) are referred to as the Individual IAB Defendants or the Woods. The remaining IAB Defendants are referred to as the Corporate IAB Defendants.

## BACKGROUND

On September 18, 2012, the Court entered a Temporary Restraining Order which froze all the IAB Defendants' assets. (DE 17.) A temporary monitor was appointed, and a preliminary-injunction hearing was held on October 4, 2012. (DE 17; DE 61; DE 114.) Following this hearing, the Court entered a Preliminary Injunction that, among other things, continued the asset freeze and appointed a permanent receiver. (DE 72.) In the Preliminary Injunction, the Court specifically found that "there is good cause to believe that the [IAB Defendants] have engaged in and are likely to engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)"; that "the FTC has established the likelihood of success in showing that the [IAB Defendants] have made serious misrepresentations leading consumers to believe, among other things, that an Association Membership is health insurance or the equivalent of such insurance"; that "the FTC has established a likelihood of success on the merits that the [IAB Defendants] violated the [Telemarketing Sales Rule (TSR), 16 C.F.R. § 310,] in numerous respects," including that the IAB Defendants "made or caused false and misleading statements to induce persons to pay for services"; that the "FTC has demonstrated a likelihood that the Individual IAB . . . Defendants are individually liable and properly subject to an asset freeze"; that the "FTC is likely to prevail in showing that . . . Defendants James C. Wood, James J. Wood, [and] Michael J. Wood . . . have, or have had, the ability to control the Corporate IAB . . . Defendants because each is an officer, manager, or majority shareholder of one or more of the Corporate IAB . . . Defendants"; that the "FTC has demonstrated it will likely prevail in showing that . . . Defendants James C. Wood, James J. Wood, [and] Michael J. Wood . . . either had knowledge of the misrepresentations, were recklessly indifferent to the fact that misrepresentations were being made, or were aware that there was a high probability that misrepresentations were made but intentionally avoided the truth"; that "there is good cause to believe that immediate and irreparable harm will result from the [IAB Defendants'] ongoing violations of the FTC Act and the TSR unless [those] Defendants are restrained and enjoined by Order of this Court"; and that "[a]fter weighing the equities and considering the FTC's likelihood of ultimate success on the merits, a preliminary injunction with an asset freeze and the appointment of a Receiver is in the public interest." (DE 72 at 3-5.)

The Receiver was authorized to, among other things, "[s]uspend business operations of the Corporate IAB . . . Defendants if in the judgment of the Receiver such operations cannot be continued legally or profitably." (*Id.* at 26.) After examining the Corporate IAB Defendants' business operations, the Receiver determined that none of those operations could continue legally or

profitably; the Receiver therefore shut them down. (DE 94 at 2; DE 155 at 2-3.) The Court affirmed this decision over the protest of the IAB Defendants. (DE 106.)

## ANALYSIS

### A. Request to stay the proceedings

The IAB Defendants seek to stay the proceedings—but not the preliminary injunction—while their appeal of the preliminary injunction is pending. They argue that because they are not seeking to stay the preliminary injunction, they do not need to demonstrate the four factors traditionally analyzed by courts in deciding whether to grant a stay pending an appeal. (DE 110 at 11.) But the two cases they cite do not even involve a request for a stay based on a pending appeal—let alone support the proposition that the four-factor test does not apply when a defendant seeks to stay only the proceedings but not the injunction pending an appeal. In *Dunn v. Air Line Pilots Association*, the district court decided not to stay the case before it while a related class-action case proceeded in another jurisdiction. 836 F. Supp. 1574, 1584 (S.D. Fla. 1993) (Davis, J.). In *Miccosukee Tribe of Indians of Florida v. South Florida Management District*, the Eleventh Circuit decided that it lacked jurisdiction to review an order staying a case pending the appeal of a judgment entered in a similar case. 559 F.3d 1191, 1193-94, 1200 (11th Cir. 2009). Because the IAB Defendants have no authority that supports abandoning the four-part test, the Court uses that test.

In deciding whether to stay a case pending an appeal, the Court must consider (1) "whether the stay applicant has made a strong showing that it is likely to succeed on the merits"; (2) "whether the applicant will be irreparably injured absent a stay"; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *FTC v Capital Choice Consumer Credit, Inc.*, 2004 WL 5141452, at *8 (S.D. Fla. May 5, 2004) (Ungaro, J.) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first factor is the most important, but a stay may be granted if equity weighs heavily in favor of it. *Id.*

None of the factors support staying this case. The Defendants' opening brief in support of the stay does not even argue that they are likely to succeed on the merits of their appeal. (*See* DE 110 at 1-13.) The closest they come is arguing that the appeal

> would raise significant issues of the destruction of 100% of a legitimate company providing valuable benefits for thirty years because of "issues" with a percent of its business and a "freeze" of the assets of not only the businesses but their owners and officers with dubious to nonexistent evidence of the restitution amount before the

>Court or the operation control of the various individual defendants over the independent-contractor conduct alleged.

(*Id.* at 3.) And this statement—which is contained in the background section of their brief, not the section supporting their request for a stay—is adduced as an example of why money needs to be released from the freeze to pay their attorney fees. (*See id.*) Although their next best example actually is in the section supporting their request for a stay, it too falls short. It is terse, vague, and does not argue that they are likely to succeed on appeal: "the IAB Defendants respectfully submit that there are serious issues for appeal relating to the Preliminary Injunction, including the provision setting forth the asset freeze and the record supporting the Court's factual findings." (DE 110 at 9.)

Attempting to rectify this shortcoming, the Defendants advance new arguments in their reply brief for why their appeal is likely to prevail. But these arguments are forfeited because they were raised for the first time in a reply brief. *See Park City Water Authority, Inc. v. North Fork Apartments, L.P.*, 2009 WL 4898354, at *1 n.2 (S.D. Ala. Dec. 14, 2009) (citing cases from 2009 in over 40 districts in which courts acknowledged the rule that arguments raised for the first time in a reply brief are ordinarily not considered).[2]

Even were the Court to consider these arguments, they are not persuasive. The Defendants argue that there was no evidence that they were recklessly indifferent to, participated in, or approved of the misleading tactics used by the telemarketers; that the FTC has not supported the amount it claims the Defendants owe to consumers as restitution; and that there was not sufficient evidence that consumers were confused about what they were buying. (DE 134 at 13-17.) The first and third arguments are undercut by the Court specifically finding based on the evidence that the "FTC has established the likelihood of success in showing that the [IAB Defendants] have made serious misrepresentations leading consumers to believe, among other things, that an Association Membership is health insurance or the equivalent of such insurance"; and that the "FTC has demonstrated it will likely prevail in showing that . . . Defendants James C. Wood, James J. Wood, [and] Michael J. Wood . . . either had knowledge of the misrepresentations, were recklessly indifferent to the fact that misrepresentations were being made, or were aware that there was a high probability that misrepresentations were made but intentionally avoided the truth." (DE 72 at 3, 5.) The second argument is meritless too. In an equitable, FTC-enforcement action like this one, defendants are liable to the extent of their ill-gotten gains. *FTC v. Bishop*, 425 F. App'x 796, 798

---

[2] The Eleventh Circuit follows a similar rule. *E.g. Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.").

(11th Cir. 2011) (citing *Commodity Futures Trading Commission v. Wilshire Investment Management Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008)). The proper measure of ill-gotten gains is revenue, not profit. *FTC v. Washington Data Resources*, No. 8:09-cv-2309-T–23TBM, 2011 WL 3566612, at *3 (M.D. Fla. July 15, 2011). From January 1, 2007 through approximately September 2012, the IAB Defendants' own records show that their revenue (sales less chargebacks and refunds) is not less than $125 million. (DE 121 at 19.) In short, the IAB Defendants have not demonstrated that they are likely to succeed on appeal. Given that this is the most important factor, this alone is likely enough to deny the stay. But there's more.

Factors two through four, which address the equities of a stay request, also do not favor the Defendants. The primary injury they argue that they will suffer absent a stay is the expense of having to simultaneously litigate in both the district and appellate courts while being subject to an asset freeze. (DE 110 at 12; DE 134 at 17-18.) But the Court is not aware of any law supporting the proposition that litigation expenses are an irreparable injury, and the IAB Defendants do not provide any. The absurdity of this argument counsels against accepting it absent authority: were the Court to accept the argument, the second factor would always favor a party seeking a stay pending that party's appeal being resolved. Moreover, in the course of denying the IAB Defendants' two most recent motions to unfreeze funds to pay legal costs, the Court found that the public interest was best served by maintaining the asset freeze and denying the Defendants access to the frozen funds. (DE 270.)

A stay would also likely prolong the receivership and, by stopping the underlying litigation's progress, increase the likelihood that funds that are not yet part of the Receivership but should be are dissipated before they can be frozen. Discovery in this case needs to continue in order for the FTC and Receiver to be sure that all ill-gotten gains are frozen to provide redress to injured consumers. Indeed, the Receiver recently filed a motion based on evidence that Jacob Wood has violated the Preliminary Injunction by failing to disclose assets and transferring funds. (*See* DE 313.) Staying the case thus threatens the other parties. For similar reasons, staying the case would go against the public interest. Equity favors the injured consumers over the Defendants who did the injuring and are now suffering the consequences of their conduct. Staying the case would likely prolong the Receivership and delay recovery for injured consumers.

Because none of the factors weigh in favor of staying the case, the Court **DENIES** the Defendants' Motion (DE 110) to stay the proceedings.

**B.      Request to lift the freeze to pay living expenses**

The Individual IAB Defendants (the Woods) ask the Court to lift the freeze so that they can pay living expenses. (DE 110; DE 217.) Collectively, the three of them request the release of over $34,650 for monthly living expenses, which amounts to over $415,800 annually. (DE 110-1 at 2-3. 6, 9-10.)

A district court has the inherent, equitable power to freeze assets "as an incident to its express statutory to issue a permanent injunction under Section 13 of the Federal Trade Commission Act." *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984). The natural corollary to this rule is that a court may unfreeze those assets when equity requires. *FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, at *4 (M.D. Fla. December 31, 2008); s*ee Commodity Futures Trading Commission v. Noble Metals International, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (holding that the district court did not abuse its discretion by precluding defendants from using frozen assets to pay their attorney fees in a civil-law-enforcement case because the "frozen assets fell far short of the amount needed to compensate [defendants'] customers"). The word *may* in the previous sentence is significant: a court has discretion to refuse to unfreeze assets so that a defendant can use those assets to pay for living expenses or attorney fees. *RCA Credit Services, LLC*, 2008 WL 5428039, at *4. When frozen assets are less than the amount needed to compensate consumers for their losses, a district court can properly refuse to unfreeze assets. *Id.* That is because one purpose of the asset freeze is to ensure that funds are available to provide consumers redress and deprive wrongdoers of their ill-gotten gains.[3] *Id.*

The principal reason the Court will not unfreeze assets to pay for the Woods' living expenses is that the Defendants' monetary liability greatly exceeds the frozen funds. As discussed previously, in an equitable, FTC-enforcement action like this one, defendants are liable to the extent of their ill-gotten gains. *Bishop*, 425 F. App'x at 798 (citing *Wilshire Investment*, 531 F.3d at 1345). The proper measure of ill-gotten gains is revenue, not profit. *Washington Data Resources*, 2011 WL 3566612, at *3. From January 1, 2007 through approximately September 2012, the IAB Defendants' own records show that their revenue (sales less chargebacks and refunds) is not less

---

[3] These rules belie the Woods' argument that courts may freeze assets when allegations of past fraud are coupled with evidence that the alleged fraudster will likely dissipate assets. There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze. *See SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734(11th Cir. 2005) ("[T]he asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement."); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2006) (Marra, J.).

than $125 million.  (DE 121 at 19.)  The frozen assets' value is a mere pittance compared to this enormous sum.  As of November 1, 2012, the largest value that could be ascribed to the frozen assets is approximately $2.812 million.[4]  (*See id.* at 4-5, 20.)  Of this amount, $438,476 was available for the Receiver to use.  (*Id.* at 20, 26.)  And the costs of the receivership over time have decreased the value of the frozen assets: as of September 6, 2013, the cash on hand for the receivership was $329,210.54.  (DE 312 at 15; DE 312-3 at 1.)  It is extremely unlikely that the frozen assets will be adequate to redress consumer injuries.  If the Court allows the Woods to use these assets for living expenses, the already inadequate assets will be further diminished.  And the Court already found when it entered the Preliminary Injunction that the equities favored an asset freeze to protect the public interest.  (DE 72 at 5.)  Given these circumstances, the Court concludes that equity favors preserving the meager frozen assets to protect consumers rather than allowing the Woods to use these likely ill-gotten assets for living expenses.

Moreover, the amounts the Woods request are unreasonable and include money for expenses that are unnecessary.  Their annual living expenses of $415,800 exceed the cash on hand for the receivership.  And the size of the request makes plain that it goes beyond satisfying mere necessities and would continue to fund a lifestyle unavailable to nearly all Americans.  They also request money for items such as insurance which the Receiver is already required to pay.

Although the Woods undoubtedly need some money for necessities—indeed, everyone does—nothing in the Preliminary Injunction prevents them from working to support themselves.  The Injunction prohibits the Woods from engaging in the marketing and sale of health-related products and services.  (DE 72 at 11.)  It does not bar them from seeking gainful employment.  Neither James's nor Jacob's declaration in support of their claimed living expenses states that they are unable to seek gainful employment.  (DE 110-1 at 2-3, 9-10.)  They similarly do not state that they have sought work.  (*Id.*)  Joshua's declarations touch on the issue of seeking other employment: his first declaration states that the Injunction will make it "difficult to impossible" to find work in his licensed fields; his second, that the Injunction makes him "unemployable" in the licensed financial industry.  (*Id.* at 5, 7; DE 134-1 at 6.)  But he offers no evidence that this is true

---

[4] This includes the unencumbered liquid assets of $829,000, the $1.7 million in nonliquid assets, Tressa Wood's 401(k) account, and the bank CD in only Tressa's name.  (The Court recently determined that these last two assets—Tressa's 401(k) account and the CD in her name—are Receivership Assets that have been properly frozen.  (DE 315.))  Moreover, the $2.812 million figure excludes the approximately $200,000 Fairmont Specialties is owed.  If this is subtracted out, the frozen assets amount to approximately $2.612 million.  (*See id.* at 4-5.)

other than his say so.  And even assuming it's true, Joshua does not state that he is unable to work in other fields nor does he describe any efforts he has made to obtain other work.  (DE 110-1 at 5-7; DE 134-1 at 5-7.)  Absent persuasive evidence to the contrary, the Court can conclude only that the Woods are capable of working to support their basic necessities.

Because the Defendants' liability dwarfs the frozen assets' value, because the amounts the Woods request are unreasonable, and because the Court finds that the Woods could work to pay for their basic necessities, the Court **DENIES** the Woods' Motions (DE 110 and DE 217) seeking relief from the asset freeze to pay living expenses.  The Court appreciates that the asset freeze is difficult for the Woods and that things would be much easier if they could access the money they gained at consumers' expense.  But "it is axiomatic that an asset freeze, set forth in the interest of preserving illegal proceeds from dissipating before there has been a final disposition on the merits, may have unpleasant consequences for the defendant, including foreclosures on real estate, injury to legitimate business enterprises and other personal hardship."  *SEC v. Schiffer*, 97 Civ. 5853, 1999 U.S. Dist. LEXIS 9723, at *3 (S.D.N.Y. June 30, 1999) (denying a motion to enjoin a foreclosure resulting from the defendant's mortgage default when the default was caused by an asset freeze imposed in a preliminary injunction).  Equity favors the injured consumers over the Defendants who did the injuring and are now suffering the consequences of their conduct.

The Defendants remaining arguments do not undercut the Court's decision to deny them relief from the asset freeze.  Relying on *Bishop* and *Washington Data*, the Defendants argue that the asset freeze encompasses assets that should not be frozen, such as Joshua's California home, and that the FTC's measure of their ill-gotten gains is incorrect.  Neither argument is persuasive.

Turning to the first argument, the Defendants contend that *Washington Data* shows that assets obtained before the alleged wrongdoing should be excluded from the asset freeze.  *Washington Data* does in fact support this very principle.  2011 WL 3566612, at *4.  But its reasoning is flawed and would perpetuate, rather than correct, an inequity.  *Washington Data* thought that *Bishop* and *Bishop*'s citation to *CFTC v. Wilshire Investment Management Corp.*, 531 F.3d 1339 (11th Cir. 2008) supported this principle.  *Id.*  They don't.  In *Bishop*, the Eleventh Circuit vacated the asset freeze imposed by the district court because the "district court abused its discretion by imposing too broad of an asset freeze without making any reasonable approximation of Defendant-Appellant's ill-gotten gains."  *Bishop*, 452 F. App'x at 798.  *Bishop* reasoned that a court's equitable power to impose an asset freeze in a case brought by the FTC ultimately stemmed from § 13(b) of the FTC Act, which authorized courts to grant injunctions.  *Id.* at 797.  Being

authorized to issue injunctions meant that courts were empowered to use the "full range of equitable remedies," including restitution and disgorgement. *Id.* Since these equitable remedies seek to "deprive the defendant of his ill-gotten gains," they do not consider the plaintiff's losses. *Id.* at 797-98. So the amount of assets that could properly be frozen—a remedy designed to ensure that assets subject to disgorgement would still be available at the end of a case—is equal to the defendant's ill-gotten gains. *Id.* at 798. Strict proof of the defendant's ill-gotten gains is not required. *Id.* All that is necessary to impose an asset freeze is a "reasonable approximation of a defendant's ill-gotten gains." *Id.* (quoting *ETS Payphones*, 408 F.3d at 735.) Because the district court in *Bishop* had imposed an asset freeze without making any reasonable approximation of the defendant's gains, the freeze had to be vacated. *Id.* *Wilshire* makes the same point about the equitable remedy of restitution: namely, that the amount of restitution awarded needs to be measured by the defendant's ill-gotten gains, not the plaintiff's losses. 531 F.3d at 1345. Because the district court had awarded restitution to the defrauded customers in the amount of their losses, the Eleventh Circuit reversed the damages award and remanded for a proper calculation based on the defendant's ill-gotten gains. *Id.* at 1343, 1345. Nothing in *Bishop* or *Wilshire* supports concluding that an asset freeze can encompass only those assets traceable to the alleged wrongdoing. *See id.* at 1343-46; *Bishop*, 452 F. App'x at 797-98. *Washington Data* was wrong to think that they did support this principle.

Moreover, there is a good reason to reject this principle: once embraced, it leads to absurd and inequitable results. Under this principle, "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an [asset freeze]." *Lauer*, 445 F. Supp. 2d at 1369 (quoting *SEC v. Banner Fund International, et al.*, 211 F.3d 602, 617 (D.C. Cir. 2000)). So even after a preliminary injunction had been imposed, such a defendant would be free to spend and waste his only remaining assets. By the time a final judgment was entered, there may very well be nothing left for such a defendant to disgorge, and the people injured would have no relief. The better rule is that the amount of assets that should be frozen before liability is conclusively established "is determined not by whether the funds themselves are traceable to the fraudulent activity underlying the lawsuit, but by showing a reasonable approximation of the amount, with interest, [that] the defendant was unjustly enriched." *Id.* at 1370. Many courts have embraced the better rule. *See id.* at 1370 (collecting cases). So just because Joshua contends that he purchased his California home before he became involved with

IAB does not exempt the home from the asset freeze. In fact, since the value of the frozen assets is dwarfed by the Defendants ill-gotten gains, that home has been properly frozen.[5]

The Defendants' second argument—that the FTC's measure of their ill-gotten gains ($125 million) is incorrect—is also unpersuasive. They argue that the $125-million figure is overstated because it supposedly ignores four items: (1) refunds that were made; (2) instances where the consumer actually got the benefit they bargained for; (3) amounts spent towards satisfying operating costs and overhead; and (4) payments to the providers of the products that IAB sold through its membership plans. (DE 110 at 8; DE 134 at 6.) But because the $125-million-revenue figure is calculated based on sales less chargebacks and refunds (DE 121 at 19), that figure did not ignore refunds. Skipping to the third and fourth "ignored" items—both of which are costs of running the business—costs do not count against revenue. Revenue is a measure of the money taken in excluding costs. Costs are subtracted from revenue to calculate profit (or loss, if costs exceed revenue). And the proper measure of ill-gotten gains is revenue, not profit. *Washington Data Resources*, 2011 WL 3566612, at *3. But even if these costs did count against revenue, the amount of the Defendants' ill-gotten gains would still surely far exceed the value of the frozen assets. That leaves only the second item—instances where the consumer got the benefit of what they bargained for. Given that the Court has already found that the FTC will likely succeed "in showing that the [IAB Defendants] have made serious misrepresentations leading consumers to believe, among other things, that an Association Membership is health insurance or the equivalent of such insurance," consumers did not get the benefit they thought they were bargaining for." (DE 72 at 3.) This point is buttressed by the Receiver's judgment that the Defendants' business could not be operated profitably if the Defendants could sell only the nonenjoined products. (DE 94 at 2; DE 155 at 2-3.) This is another way of saying that consumers would not have bought the Defendants' products were it not for the consumers being duped into thinking that the membership plans offered major or traditional health insurance, or the equivalent of such insurance. So the benefit that consumers were bargaining for was illusory: they did not receive the benefit they bargained for. And even if some allowance were made for the other "benefits" of becoming a member in the Defendants' association, the resulting figure, though less than $125 million, would still dwarf the value of the frozen assets. Moreover, the Court is not required to determine the Defendant's ill-gotten gains with "exactitude"; all that is required is a "reasonable approximation," a burden the Eleventh Circuit

---

[5] The Court previously determined this home is a Receivership Asset that has been properly frozen. (DE 315 at 2.) The above analysis simply buttresses this conclusion.

has characterized as "slight." *ETS Payphones*, 408 F.3d at 735.  That standard has surely been met here.

In sum, the Court concludes that the public interest is best served by maintaining the asset freeze and denying the IAB Defendants' requests to release frozen funds to pay for living expenses.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** the IAB Defendants' Motion seeking a stay (DE 110) and their Motions (DE 110 and DE 217) seeking the release of funds to pay living expenses.

**DONE and ORDERED** in chambers, at Miami, Florida, on September 18, 2013.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**